**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

PAMELA BELLINGER, ERIC BOHN,
JASON ANDRE BURNS, DARLENE
CARTER, DAVID GOLLADAY,
FRANCINE MARGARET HALL,
PATRICK RALPH HANSEN, MILTON
HARRIS, TALLIS JORDAN, WALLACE C.
NELSON, WILLIAM ERNEST RANDALL,
BARRY SHAPIRO, JEFFERY STEVEN
STILL, CHAD EDWARD STONE, and
KAREN STRACHE,

        *Plaintiffs*,

     vs.

3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.); AGC CHEMICALS
AMERICAS INC.; AMEREX
CORPORATION; ARCHROMA U.S., INC.;
ARKEMA, INC.; BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT
COMPANY; CARRIER GLOBAL
CORPORATION; CHEMDESIGN
PRODUCTS, INC.; CHEMGUARD, INC.;
CHEMICALS INCORPORATED; CHUBB
FIRE, LTD.; CLARIANT CORPORATION;
CORTEVA, INC.; DEEPWATER
CHEMICALS, INC.; DUPONT DE
NEMOURS, INC.; DYNAX
CORPORATION; E. I. DUPONT DE
NEMOURS AND COMPANY; MINE
SAFETY APPLIANCES CO., LLC.;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.; RAYTHEON
TECHNOLOGIES CORPORATION (f/k/a
United Technologies Corporation); THE
CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC; and,
JOHN DOE DEFENDANTS 1-49,

Case No.:

COMPLAINT WITH JURY DEMAND

*Defendants*.

_____/

## **COMPLAINT**

COME NOW, PAMELA BELLINGER, ERIC BOHN, JASON ANDRE BURNS, DARLENE CARTER, DAVID GOLLADAY, FRANCINE MARGARET HALL, PATRICK RALPH HANSEN, MILTON HARRIS, TALLIS JORDAN, WALLACE C. NELSON, WILLIAM ERNEST RANDALL, BARRY SHAPRIO, JEFFERY STEVEN STILL, CHAD EDWARD STONE, and KAREN STRACHE (collectively "Plaintiffs"), by and through their undersigned counsel, and bring this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., Amerex Corporation, Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Mine Safety Appliances Co., LLC, Nation Ford Chemical Company, National Foam, Inc., Raytheon Technologies Corporation (f/k/a United Technologies Corporation), The Chemours Company, The Chemours Company FC, LLC, and John Doe Defendants 1-49 (collectively, "Defendants"), and allege as follows:

## I.     **INTRODUCTION**

1.     This action arises from both the foreseeable contamination of groundwater by the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS").[1]

_____

[1] PFAS includes perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2.     PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat, and water. PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

3.     PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

4.     PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

5.     PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure in humans can occur through inhalation, ingestion, and dermal contact.[2]

6.     Due to this contamination, Plaintiffs have suffered real personal injuries, bioaccumulation of PFAS in their bodies as a result of the release of PFAS to their water supplies.

7.     Plaintiffs have suffered an assortment of diseases and medical conditions as a direct result of their exposure to the PFAS contamination of their water supply.

---

[2] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

8.      Plaintiffs, as residents and those who visited, worked, or otherwise dwelled in the Site areas, and have been unknowingly exposed for many years to PFAS, including at concentrations hazardous to their health.

9.      Plaintiffs' unwitting exposure to PFAS in their water supply as a result of the Defendants' conduct, is the direct and proximate cause of Plaintiffs' injuries.

10.     Unbeknownst to Plaintiffs, Defendants have manufactured, marketed, distributed, sold, and/or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in non-military specification Class B firefighting foams ("Class B foam").[3]

11.     Plaintiffs seek recovery from Defendants for injuries, damages, and losses suffered by the Plaintiffs as a result of exposure to the introduction of PFAS and other toxic substance into their water supply, and then into their properties and bodies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

**Aqueous Film-Forming Foam**

12.     For decades, Defendants manufactured, marketed, distributed, and sold aqueous film-forming foam ("AFFF") or its component fluorochemicals and fluorosurfactants containing per- and polyfluoroalkyl substances ("PFAS") (collectively, "AFFF Products"). Despite knowing that when used as directed AFFF releases toxic PFAS chemicals into the environment, and despite knowing that PFAS pose significant threats to the environment and human health, Defendants continued to manufacture, market, distribute, and sell AFFF Products—and they did so without warning the public, and without taking any steps to modify their products to avoid these harms.

---

[3] Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors. The most common Class B foam is aqueous film-forming foam (or "AFFF").

13.     AFFF is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades by military and civilian firefighters to extinguish fires in training and in response to Class B fires.

14.     PFAS are synthetic and highly toxic, carcinogenic chemicals that include perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), GenX chemicals, and/or other per- and polyfluoroalkyl substances and their precursors. PFAS bind to proteins in the blood of humans exposed to the substance and persists in the body over long periods of time. PFAS are also known as "forever chemicals" because they are immune to degradation, concentrate in human blood, bones, and organs, and increase in concentration up the food chain.

15.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy induced hypertension.

16.     Because of the disastrous human health effects posed by PFAS, the Plaintiffs consumption, inhalation, or dermal absorption of Defendants' PFAS chemicals substantially increased the risk that each Plaintiff will develop serious medical conditions associated with PFAS exposure.

17.     As Defendants were fully aware, PFAS contamination is devastating to the environment. When AFFF is released, PFAS quickly migrate from soil to surface water and groundwater, entering drinking water supplies. These chemicals then wreak havoc at each level of the food chain, building up in plants, fish, wildlife, and eventually humans. These chemicals then continue their migratory cycle in the environment by being transported through wastewater and biosolids.

18.     PFAS contamination also poses serious threats to human health. PFAS exposure has been associated with serious, adverse health effects in humans and can occur through inhalation, ingestion, and dermal contact. Research has linked human PFAS exposure to increased cholesterol levels, liver damage or changes in liver function, decreases in body vaccine response, increased risk of high blood pressure or preeclampsia in pregnant women, lower infant birth weights, and higher risks of kidney and testicular cancer.

19.     Defendants' AFFF Products have been stored and released in areas within and adjacent to numerous United States Air Force Military Bases. Because of Defendants' reckless and unlawful conduct, many United States Air Force Bases' drinking water and natural resources including its groundwater, surface water, soil, plants and animal life—are contaminated with toxic PFAS chemicals.

20.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the United States when they knew or reasonably should have known that Plaintiffs would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises, in firefighting emergencies, and regular civilian use of water, and that such exposure would threaten the health and welfare of firefighters and civilians exposed to these dangerous and hazardous chemicals.

21.     Defendants' AFFF Products have been stored and released in areas within and adjacent to the various military installations discussed *infra*. Because of Defendants' reckless and unlawful conduct, the Plaintiff's drinking water the military installations natural resources— including its groundwater, surface water, soil, plants and animal life—are contaminated with toxic PFAS chemicals. Defendants collectively designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or

otherwise released into the stream of commerce AFFF with knowledge that it contained highly toxic and bio-persistent PFAS.

22.     As a result of their conduct and the harms they have caused, Defendants are liable to Plaintiffs for medical monitoring as a result of each Plaintiff's exposure to a PFAS contaminated water supply. Plaintiffs further seek injunctive, equitable, and declaratory relief arising from the same conduct by Defendants.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over the parties and claims brought herein under 28 U.S.C. § 1331. The claims herein arise from exposure to PFAS contaminated water sources on or stemming from bases operated by the United States Army and/or Air Force. Many Plaintiffs were exposed as a result of their service duties with the United States Army or Air Force. Where tort claims arise out of toxic exposure to chemicals on federally owned and operated property, federal enclave jurisdiction exists. Therefore, Plaintiffs' claims present a question arising under federal law and are properly brought in this Court.

24.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiffs were residents and/or citizens, a substantial part of the events or omissions giving rise to the claims occurred, and/or Defendants conduct business within the district.

25.     The United States District Court for the Southern District of Florida further has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants purposefully manufactured, designed, marketed, advertised, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including AFFF, to various locations in the United States and Florida, such that each Defendant

knew or should have known that said products would be delivered to areas in Florida for active use including, but not limited to, during the course of training and firefighting activities, including areas within Plaintiffs' drinking water supply.

26.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants engaged in business in the State of Florida.

27.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in Florida, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, advertising and/or otherwise being responsible for PFAS chemicals, and that said activity by the Defendants is substantially connected to the Plaintiffs' claims as alleged herein.

28.     Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of Florida giving rise to the underlying controversy.

29.     At all times pertinent to this action, the Defendants had actual knowledge that each of the other Defendants was going to intentionally or negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiffs.

30.     Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Southern District of Florida does not offend traditional notions of fair play and substantial justice.

31.     Joinder of all parties is proper pursuant to Rule 20(a) of the Federal Rules of Civil Procedure. Defendants are permissively joined in this action because the exposure, injuries, and

relief requested all arise out of similar transactions or occurrences and questions of law and fact are common to all parties.

## PARTIES

### A. PLAINTIFFS:

32.     Plaintiff, **PAMELA BELLINGER** resides 4748 Valley St Sullivan, MO 63080. Plaintiff was a dependent on the Naval Construction Battalion Center (MS), (hereinafter the "Site"), from 1983 to 1985 and was living on base at the Site during those times. While living on base at the Site, Plaintiff was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Claimant has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff, Pamela Bellinger's exposure, she has been diagnosed with Thyroid Cancer and High Cholesterol.

33.     Plaintiff, **ERIC BOHN**, resides at 24125 Seal Road, Richland, Missouri 65556. Plaintiff was formerly stationed at U.S. Army Fort Dix for approximately eight (8) weeks in 1990, U.S. Army Aberdeen Proving Ground for approximately four and a half (4.5) months in 1991, U.S. Army Camp Shelby for approximately two (2) weeks in 1992, U.S. Army Garrison-Humphreys for approximately three (3) weeks in 1993, U.S. Army Camp Shelby from approximately 1994 to 1998, U.S. Army Fort Irwin – The National Training Center for approximately three (3) weeks in 1999 and approximately two (2) weeks in 2001, and U.S. Army Camp Shelby approximately in 2000, and was living on base at the Sites during those times. While living on base at the Sites, ERIC BOHN, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. ERIC BOHN has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health.

As a direct and proximate result of Plaintiff, ERIC BOHN's exposure, he has been diagnosed with Hypothyroidism, Hypercholesterolemia, and Hyperlipidemia.

34.     Plaintiff, **JASON ANDRE BURNS**, resides at 3757 171st Place, Country Club Hills, Illinois 60478. Plaintiff was formerly stationed at Marine Corps Base Camp Pendleton from approximately 1993 to 1997 and was living on base at the Site during that time. While living on base at the Site, JASON ANDRE BURNS, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. JASON ANDRE BURNS has been exposed for many years to PFAS as a result of the PFAS contamination at the Site, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, JASON ANDRE BURNS' exposure, he has been diagnosed with Hypothyroidism and Hyperlipidemia.

35.     Plaintiff, **DARLENE CARTER** resides at 4951 Woodstone Drive, San Antonio, Texas 78230. Plaintiff was formerly stationed at Fort Gordon, Fort Jackson, NATO (Belgium), Fort Ritchie, Seoul and Fort Huachuca (collectively the "Sites") between 1979 to 1984 and was living on base at the Sites during those times. Additionally, Plaintiff formerly resided with her family at Fort Bragg, Giessen Army Depot (Germany), Fort Riley, U.S Army Garrison Bamberg (Germany) and Fort Hood. (collectively the "Sites") from 1985 to 1999 and was living on base at the Sites during those times. While living at the Sites, DARLENE CARTER was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. DARLENE CARTER has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of DARLENE CARTER's exposure, she has been diagnosed with Hyperthyroidism and Hyperlipemia.

36.     Plaintiff, **DAVID GOLLADAY** resides 14115 SW Windjammer Court Beaverton, Oregon 97005. Plaintiff was formerly stationed at Joint Base Elmendorf-Richardson and the Portland Air National Guard Base (hereinafter the "Sites") from 1983-1994 and was living on base at the Sites during those times. While living on base at the Sites, Plaintiff was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Plaintiff has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff David Golladay's exposure, he has been diagnosed with Hypothyroidism.

37.     Plaintiff, **FRANCINE MARGARET HALL**, resides at 11895 East Blue Cove Drive, Dunnellon, Florida 34432. Plaintiff was formerly stationed at Marine Corps Recruit Depot Parris Island from approximately 1991 to 1992, Naval Support Activity Mid-South from approximately 1992 to 1993, Naval Air Station Cecil Field for approximately three (3) months in 1993, Marine Corps Air Station Beaufort approximately in 1993, Naval Air Station Fallon for approximately one (1) month in 1993, Aviano Air Base from approximately 1993 to 1994, Marine Corps Air Station Beaufort from approximately 1994 to 1995, and was living on base at the Sites during those times. While living on base at the Sites, FRANCINE MARGARET HALL, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. FRANCINE MARGARET HALL has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to her health. As a direct and proximate result of Plaintiff, FRANCINE MARGARET HALL's exposure, she has been diagnosed with Thyroid Cancer, Hyperthyroidism, and Hyperlipidemia.

38.     Plaintiff, **PATRICK RALPH HANSEN**, resides at 3380 Saiko Road, Rhodes, Michigan 48652. Plaintiff was formerly stationed at Lackland Air Force Base from approximately

1971 to 1972, Kunsan Air Base from approximately 1972 to 1973, Altus Air Force Base for approximately eight (8) months in 1973, Kunsan Air Base from approximately 1974 to 1975, and Wurtsmith Air Force Base from approximately 1975 to 1978, and was living on base at the Sites during those times. While living on base at the Sites, PATRICK RALPH HANSEN, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. PATRICK RALPH HANSEN has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, PATRICK RALPH HANSEN's exposure, he has been diagnosed with Hypothyroidism, Hypercholesterolemia, and Dyslipidemia.

39.     Plaintiff **MILTON HARRIS** resides at 341 Roberts Avenue Southwest Norton, VA 24273. Plaintiff was formerly stationed at the Castle Air Force Base (hereinafter the "Site") from 1980 to 1983 and was living on base at the Sites during those times. While living on base at the Sites, Plaintiff was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Plaintiff has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff MILTON HARRIS's exposure, Plaintiff has been diagnosed with Hyperthyroidism.

40.     Plaintiff, **TALLIS JORDAN**, resides at 3271 Limber Pine Drive, Whiteland, Indiana 46184. Plaintiff is a former United States Army service member who worked and/or resided on or near various United States Army installations throughout his lifetime, including Fort Lewis, Fort Benning, and Fort Drum. Plaintiff was born on Fort Lewis and resided on base from approximately 1995 to 1997. Plaintiff began his military service in 2014 and, between 2014 and 2018, was stationed and lived at or near Fort Lewis, Fort Benning, and Fort Drum. During this

period, he was also temporarily assigned to other military installations, including Fort Irwin, the Yakima Training Center, Schofield Barracks, and Fort Polk (collectively referred to as the "Sites"). While living on or near base at the Sites, TALLIS JORDAN regularly consumed water containing elevated levels of PFAS chemicals and was thereby exposed to PFAS chemicals at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, TALLIS JORDAN's exposure, he has been diagnosed with Ulcerative Colitis.

41.    Plaintiff, **WALLACE C. NELSON**, resides at 7204 East Grand River Avenue, LOT 124, Portland, Michigan 48875. Plaintiff was formerly stationed at Marine Corps Base Camp Pendleton from approximately 1996 to 2000, Marine Corps Base Camp Schwab approximately in between 1996 to 2000, Marine Corps Base Quantico from approximately 2001 to 2004, U.S. Army Fort Campbell from approximately 2005 to 2006, U.S. Army Garrison Schweinfurt from approximately 2007 to 2009, U.S. Army Fort Campbell from approximately 2009 to 2011, and was living on base at the Sites during those times. While living on base at the Sites, WALLACE C. NELSON, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. WALLACE C. NELSON has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, WALLACE C. NELSON's exposure, he has been diagnosed with Ulcerative Colitis.

42.    Plaintiff, **WILLIAM ERNEST RANDALL**, resides at P.O. Box 224, Milan, Illinois 61264. Plaintiff was formerly stationed at U.S. Army Fort Leonard Wood for approximately four (4) months in 1983 and at U.S. Army Fort Riley in approximately 1983 (collectively the "Sites"). Plaintiff lived on base at the Sites during those time periods. While living on base at the Sites, Plaintiff was exposed to PFAS through daily activity and regularly consumed

water containing elevated levels of PFAS. Plaintiff, WILLIAM ERNEST RANDALL has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, WILLIAM ERNEST RANDALL's exposure, he has been diagnosed with Hypothyroidism and Hyperlipidemia.

43.     Plaintiff, **BARRY SHAPRIO** resides at 206 Highlands Lake Drive, Cary, North Carolina 27518. Plaintiff formerly resided in Huntsville, Alabama from 1984 to 1992, and in Cary, North Carolina from 1994 to the present day. While living at the above-referenced Sites, Plaintiff was exposed to PFAS through daily activity and regularly consumed contaminated water containing elevated levels of PFAS. Plaintiff, BARRY SHAPRIO has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, BARRY SHAPIRO's exposure, he has been diagnosed with kidney cancer. Plaintiff has suffered both personal and monetary damages due to his condition and continues to suffer in fear of future illnesses and metastatic disease.

44.     Plaintiff, **JEFFERY STEVEN STILL**, resides at 234 East 2nd Street, Hummelstown, Pennsylvania 17036. Plaintiff was formerly stationed at Marine Corps Air Ground Combat Center for approximately three (3) months in 1980, Marine Corps Base Camp Pendleton from approximately 1980 to 1983, Marine Corps Base Camp Elmore from approximately 1983 to 1984, Marine Corps Base Camp Foster from approximately 1984 to 1985, and Clark Air Base approximately in 1984. Plaintiff lived on base at the Sites during those times. While living on base at the Sites, JEFFERY STEVEN STILL, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. JEFFERY STEVEN STILL has been

14

exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, JEFFERY STEVEN STILL's exposure, he has been diagnosed with Hypothyroidism and Hyperlipidemia.

45.    Plaintiff, **CHAD EDWARD STONE**, resides at 2093 Pilot Westfield Road, Pilot Mountain, North Carolina 27041. Plaintiff was formerly stationed at U.S. Army Fort Leonard Wood for approximately three (3) months in 1997, Sheppard Air Force Base for approximately three (3) months in 1997, U.S. Army Fort Sill for approximately two (2) weeks in 1997, U.S. Army Fort Bragg (formerly known as Fort Liberty) from approximately 2001 to 2003, U.S. Army Fort Lee for approximately four (4) months in 2003, U.S. Military Camp Diamondback approximately in 2005, U.S. Army Camp Arifjan approximately in 2005, and was living on base at the Sites during those times. While living on base at the Sites, CHAD EDWARD STONE, was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. CHAD EDWARD STONE has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to his health. As a direct and proximate result of Plaintiff, CHAD EDWARD STONE's exposure, he has been diagnosed with Hypothyroidism.

46.    Plaintiff **KAREN STRACHE** resides 1127 S. Lane Grimsley, Tennessee 38565. Plaintiff was formerly residing on or near K.I. Sawyer Air Force Base, Joint Base Lewis-McChord, Dyess Air Force Base, McConnell Air Force Base, and Minot Air Force Base (collectively the "Sites") from 1971 to 2000. Plaintiff lived on base at the Sites during those times. While living on base at the Sites, Claimant was exposed to PFAS through daily activity and regularly consumed water containing elevated levels of PFAS. Claimant has been exposed for many years to PFAS as a result of the PFAS contamination at the Sites, including at concentrations hazardous to their

15

health. As a direct and proximate result of Plaintiff Karen Strache's exposure, Plaintiff has been diagnosed with Hypothyroidism.

### B. DEFENDANTS

47.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of the Fluorosurfactant Products that have and continue to cause injury the Plaintiffs:

a.  Defendant **The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. 112. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS in Florida and those states and locations where Plaintiffs were exposed, including but not limited to PFOA and PFOS.

b.  Defendant **The Chemours Company ("Chemours Co.")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, DE, 19899. In 2015, DuPont spun off its performance chemicals business line, which includes its fluoroproducts business, to Chemours Co., and Chemours Co. has since been an independent, publicly traded company. Chemours Co. does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed, and manufactured and sold AFFF

c.  Defendant **The Chemours Company FC, LLC ("Chemours FC")**, successor-in-

interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Florida.

d.  Defendant **DuPont de Nemours, Inc.** is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.  Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). New DuPont is registered to do business in Florida.

e.  Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Florida.

f.  Defendant **Chemguard, Inc. ("Chemguard")** is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Florida. Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of Florida.

g.  Defendant **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, United

Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

h.  Defendant **Carrier Global Corporation ("Carrier Global")** is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. On information and belief, Carrier Global was formed in March 2020 when Defendant United Technologies Corporation spun off its fire and security business before it merged with Raytheon Company in April 2020. On information and belief, Kidde-Fenwal, Inc., a manufacturer of AFFF products, became a subsidiary of Carrier Global when Defendant United Technologies Corporation spun off its fire and security business in March 2020. Carrier Global does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed, and manufactured and sold AFFF.

i.  Defendant **Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech")** is a Delaware corporation with its principal place of business at 1000 Wilson Boulevard, Arlington, Virginia 22209. Raytheon Tech f/k/a United Tech is registered to do business in Florida. Raytheon does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed.

j.  Defendant **Buckeye Fire Equipment Company ("Buckeye")** is an Ohio corporation

18

with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Upon information or belief, Buckeye has conducted and/or availed itself of doing business throughout the United States, including in Florida.

k.   Defendant **Arkema Inc. ("Arkema")** is a corporation organized and existing under the laws of Pennsylvania with a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Upon information and belief, the assets of Arkema's fluorochemical business were purchased by Defendant DuPont in 2002. Arkema does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed, and manufactured and sold AFFF. Arkema is registered to do business in Florida.

l.   Defendant **BASF Corporation ("BASF")** is a corporation organized and existing under the laws of Delaware with a principal place of business at 100 Park Avenue, Florham Park, NJ 07932. On information and belief, BASF is the successor-in-interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF. On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America. BASF does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed, and manufactured and sold AFFF.

m.   Defendant **ChemDesign Products, Inc.** is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.  Upon information and belief, ChemDesign Products, Inc. has conducted and/or availed itself

of doing business throughout the United States, including in Florida.

n.   Defendant **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York with a principal place of business at 4000 Monroe Road, Charlotte, NC 28205. Upon information and belief, Clariant is successor-in-interest to Sandoz Chemicals Corporation ("Sandoz"). Upon information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995. Clariant does and/or has done business throughout the United States, including in Florida and those states and locations where Plaintiffs were exposed, and manufactured and sold AFFF.

o.   Defendant **Chemicals Incorporated** is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, Chemicals Incorporated has conducted and/or availed itself of doing business throughout the United States, including in Florida.

p.   Defendant **Nation Ford Chemical Company** is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company has conducted and/or availed itself of doing business throughout the United States, including in Florida.

q.   Defendant **AGC Chemicals Americas, Inc. ("AGCCA")** is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.  Upon information and belief, AGCCA is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.  Upon information and belief, AGCCA has conducted and/or availed itself of doing business throughout the United States, including in Florida.

20

r.  Defendant **Deepwater Chemicals, Inc.** is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater Chemicals, Inc. has conducted and/or availed itself of doing business throughout the United States, including Florida.

s.  Defendant **Dynax Corporation** is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, Dynax Corporation has conducted and/or availed itself of doing business throughout the United States, including in Florida.

t.  Defendant **Amerex Corporation ("Amerex")** is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsville Highway, Trussville, AL 35173. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF in Europe. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

u.  Defendant **Archroma U.S., Inc.** is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC. Upon information and belief, Archroma U.S., Inc. has conducted and/or availed itself of doing business throughout the United States, including in Florida.

v.  Defendant **Mine Safety Appliances Co., Inc. ("MSA")** is a Pennsylvania corporation

21

and does business throughout the United States. MSA has its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS.

w. Upon information and belief, Defendants **John Doe 1-49** were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to cause injury to Plaintiffs. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

48. When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

49. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

50. The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint unless otherwise stated.

## FACTUAL ALLEGATIONS

**A.** **PFAS is a threat to the environment and human health; the toxicity of AFFF Products and PFAS.**

51.     PFAS are chemical compounds containing fluorine and carbon. PFAS are a class of thousands of chemicals that include carbon chains containing at least one carbon atom on which some or all hydrogen atoms are replaced by fluorine atoms. All PFAS chemicals are entirely manmade and do not occur in nature.

52.     The two most widely studied types of these substances are PFOA and PFOS.

53.     PFAS have been dubbed "forever chemicals" because they do not readily break down in the environment. The carbon-fluorine bond in PFAS is one of the strongest bonds in chemistry. As a result, PFAS are thermally, chemically, and biologically stable.

54.     These forever chemicals are also highly mobile. Once these forever chemicals are introduced, they migrate through the surrounding environment through surface water, soil, and groundwater. In short, once introduced in one area, PFAS are likely to contaminate a large area of natural resources and are difficult and costly to remove.

55.     PFAS is also bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain.

56.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

57.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so they bioaccumulate in individual organisms for significant

periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

58.     PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

59.     The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

60.     PFAS, as a whole, are highly noxious chemicals that have been associated with several adverse health outcomes in relevant scientific literature. According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects, and other effects (e.g., cholesterol changes)."[4]

61.     PFOA and PFOS are highly water soluble, increasing the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.

**B.     Aqueous Film-Forming Foam ("AFFF")**

62.     In the 1960s, 3M used its patented ECF process to develop Aqueous Film-Forming Foam ("AFFF"). 3M's ECF-based AFFF contains both PFOS and PFOA. 3M was the sole supplier of AFFF from the mid-1960s until 1973. 3M continuously manufactured and sold ECF-based

---

[4] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

AFFF from the mid-1960s through 2001. 3M reached an agreement with the EPA in 2000 to voluntarily stop producing its ECF-based AFFF by 2002.

63.     In 1973, other Defendant manufacturers began entering the AFFF market. Besides 3M, all other Defendants' AFFF Products were produced using fluorotelomerization ("FT"). FT-27-based AFFF contain polyfluorinated compounds that degrade into compounds that include PFOA. From 1973 onward, FT-based AFFF manufacturers were included on the U.S. military-qualified products list and could directly compete with 3M.

64.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

65.     Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

66.     AFFF is a Class B foam; to use Class B foam, a Class B foam concentrate must first be mixed with water.

67.     Class B foam is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, and chemical spills.  Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished.  The most common non-military Class B foam is aqueous film-forming foam ("AFFF").  AFFF and other Class B foams contain PFAS.

68.     AFFF is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common in transportation accidents, aircraft accidents, and chemical spills.  Class B foam is also used in

structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished.  The most common non-military Class B foam is aqueous film-forming foam ("AFFF").  AFFF and other Class B foams contain PFAS.

69.     Class B foam concentrate is typically sold in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of the fire engine. To mix the foam concentrate and water from a fire engine that is not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam, and for cleaning the equipment (hoses, nozzles, etc.) after use.

70.     The process of preparing and applying Class B foam, applying the foam, and then cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by individuals and their fire departments to mix and prepare the Class B foam for use did not say that the foam contains PFAS and did not warn individuals of the serious health risks associated with exposure to PFAS.

71.     Class B foam is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose, appliance, or nozzle.

72.     The techniques used for "laying a blanket" of Class B foam in fire extinguishment include banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls, and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.

73.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment and result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

### C.     PFAS-Containing Turnout Gear

74.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves. Each component of the jacket and pants are made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

75.     PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.  A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters.[5]

---

[5] Graham Peaslee et al*., Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").

76.     When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust,[6] exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.[7] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.[8]

77.     Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." [9] The memo concluded "continued exposure is not tolerable." [10]

78.     The Plaintiffs who wore turnout gear did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing their duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that they routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing their duties. The turnout gear worn or used by these Plaintiffs did not contain labeling information saying that the gear contains PFAS, and similarly did not warn Plaintiffs of the health risks associated with exposure to PFAS.

---

[6] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.
[7] *Id*.
[8] *Id*.
[9] Robert Bilott, *Exposure*, 174 (2019).
[10] *Id*. at 175.

79.     These exposures to PFAS or PFAS-containing materials resulted in serious and life-threatening diseases to Plaintiffs and continue to pose a significant health threat to him given the bioaccumulation, pervasiveness, and persistence of PFAS.

80.     PFAS are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, turnout gear used by firefighters, and AFFF.

### D.     DEFENDANTS' FLUOROSURFACTANT PRODUCTS

81.     In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

82.     AFFF is a type of water-based foam that was first developed in the 1960s the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

83.     PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.[11]  Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.[12]  Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.[13]

---

[11] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited September 30, 2021), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.
[12] *Id.*
[13] Robert Bilott, *Exposure*, at 174; Monica Amarelo, *Study: Almost All Fluorine Detected in Fire Stations' Dust Is From Unknown "Forever Chemicals,"* Environmental Working Group (February 5, 2021), https://www.ewg.org/release/study-almost-all-fire-stations-dust-unknown-forever-chemicals.

84.     PFAS are nearly indestructible and are highly transportable.[14]  PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact. [15]

85.     PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS.[16]

86.     Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[17]

87.     In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX," finding that two of Defendant

---

[14] *Toxicological Profile for Perfluoroalkyls*, *see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited October 19, 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.
[15] *Id*. at 3-4; Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, Environmental Working Group (January 13, 2020).
[16] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chem. And Eng'g News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, *FDA Studies: 'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Stephan Brendel et al., *Short-chain Perfluoroalkyl Acids: Environmental Concerns and A Regulatory Strategy Under REACH*, Env't Sci. Eur., Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, *The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS*, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.
[17] Martin Scheringer et al., *Helsingør Statement on Poly- and Perfluorinated Alkyl Substances* (PFASs), Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X.

Chemours GenX chemicals are ***more toxic*** than PFOA - the highly toxic chemical they were intended to replace.[18]

88.     In December 2022, in response to the alarming research on the dangers of these substances, Congress enacted the Protecting Firefights from Adverse Substances (PFAS) Act, which directs federal agencies to develop best practices, training, and educational programs to reduce, limit and prevent exposure to PFAS.[19]

89.     On March 14, 2023, the EPA put forth their proposal to establish legally enforceable levels for PFAS known to occur in drinking water.[20] The proposed regulation includes Maximum contaminant Levels (MCLs) which, if finalized, are legally enforceable regulatory drinking water standards. EPA establishes MCLs as close as feasible to the health based, non-enforceable, Maximum Contaminant Level Goal (MCLG), taking into consideration the ability to measure and treat to remove a contaminant, as well as the costs and benefits.[21] The EPA proposes to set the MCLG at **zero** for PFOS and PFOA.[22]

90.     Approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bioaccumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.  These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body, assuming, of course, the body experiences no additional PFAS chemical exposure.

---

[18]Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA*, Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistentpollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40.

[19] Protecting Firefighters from Adverse Substances Act, Pub. L. No. 117-248, 136 Stat 2348 (2022).

[20]  *See* Notice of Proposed Rulemaking, EPA-HQ-OW-2022-0114, https://www.epa.gov.sdwa/and-polyfluoralkyl-substances-pfas.

[21] *See* 42 U.S.C. § 300g–1(b)(4)(B).

[22] *Id*.

91.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to EPA information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiff, or the public about the health impacts resulting from exposure to PFAS.   Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.

92.     To date, there is no safe, acceptable, or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.[23]

93.     AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

94.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires. It is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion. AFFF is typically sprayed directly onto a fire.

---

[23] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), U.S. Env't Prot. Agency, (Nov. 2017), https://19january2021snapshot.epa.gov/sites/static/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

95.     The AFFF products made by AFFF Defendants contained either or both PFOA and PFOS.

96.     The AFFF produced, marketed and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.

97.     Upon information and belief, from 1960s through the mid-2000s, 3M manufactured, designed, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors within the United States and raw materials containing PFOA and/or its chemical precursors for use in the production of AFFF within the United States.

98.     Upon information and belief, the other AFFF Defendants used telomerization to produce AFFF; fluorochemicals made through telomerization degrade and/or contain PFOA but not PFOS.

99.     AFFF Defendants designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise handled AFFF containing toxic PFAS, or underlying PFAS containing chemicals used in AFFF production, that were used by entities around the country, including military, county, and municipal firefighting departments.

100.    AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS, in such a way as to cause the contamination of Plaintiffs' blood and/or body with PFAS, and the resultant bio-persistence and bio-accumulation of such PFAS in the blood and/or body of Plaintiffs.

101.    When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters). When using Defendants' AFFF, firefighters absorb PFAS, including PFOA and PFOS, through their skin, inhale PFAS, and/or inadvertently ingest PFAS.

102.    PFOA and PFOS bio-accumulate in the human body and can cause serious injuries.

103.    AFFF can be made without PFOA and PFOS. Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health threat to firefighters.

**E.    AFFF'S Hazardous Effects**

104.    AFFF and its components are associated with a wide variety of adverse health effects. Exposure to Defendants' AFFF products has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, liver cancer, pancreatic cancer, prostate cancer, breast cancer, colon cancer, ovarian cancer, lymphoma, thyroid disease, thyroid diseases, kidney disease, ulcerative colitis, infertility, and pregnancy induced hypertension.

105.    By at least the end of the 1960s, animal toxicity testing performed by some Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

106.    On information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFOA and PFOS.

107.    Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they

failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

108.    During the same time period, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that such materials, including but not limited to PFOA, owing to their unique chemical structure, were resistant to environmental degradation and would persist in the environment 'forever' unaltered if released.

109.    By at least the end of the 1970s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that one or more such materials, including but not limited to PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and persist over long periods of time and would accumulate in the blood/body of the exposed individuals with each additional exposure.

110.    By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that at least one such PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

111.    It was understood by AFFF Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and was known not to occur in humans.

112.    By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of

carcinogenesis classification mandated AFFF Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

113.    During the same time period, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including but not limited to PFOA. These data were not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

114.    Some Defendants, including at least 3M and DuPont, understood that, not only did PFAS, including, but not limited to, PFOA and PFOS, enter into, persist and accumulate in human blood and in the human body; but that once in the human body and blood, PFAS have a long half-life, particularly the longer-chain PFAS, such as PFOS and PFOA. As a result, increasing levels of PFAS chemicals were allowed to build up and accumulate in the blood and/or body of exposed individuals over time, particularly in cases of continuous or repeated PFAS exposure.

115.    By at least the end of the 1990s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

116.    By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS caused each of the tumors found in animal studies had still not been identified, mandating that AFFF Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

36

117.     By at least 2010, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including but not limited to PFOA. The adverse health impacts included increased cancer incidences, hormone changes, lipid changes, thyroid, and liver impacts.

118.     When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, AFFF Defendants repeatedly assured and represented to such entities and the public that such exposure presented no risk of harm and were of no significance.

119.     After the USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, AFFF Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

120.     AFFF Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials have been found in human blood.

121.     By at least the mid-2010s, AFFF Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

122.     Research and testing performed by and/or on behalf of AFFF Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same,

similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

123. Nevertheless, AFFF Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States present no risk of harm and are of no legal, toxicological, or medical significance of any kind.

124. At all relevant times, AFFF Defendants, individually and/or collectively, have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that AFFF Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards AFFF Defendants deem acceptable despite possessing more than ample resources and the ability to have done so.

125. Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, AFFF Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and are of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental

entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

126.    At all relevant times, AFFF Defendants shared and/or should have shared among themselves all relevant information relating to the presence, bio-persistence, and bio-accumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

127.    As of the present date, blood serum testing and analysis by AFFF Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically, demonstrably present in approximately 99% of the current population of the United States.

128.    There is no naturally occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood. All PFAS detected and/or present in human blood are present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

129.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiffs from discovering the existence and extent of any injuries/harm as alleged herein.

130.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any

potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

131.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiffs to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiffs' blood.

132.    At all relevant times, Defendants encouraged the continued and even further increased use of PFAS by their customers and others, including but not limited to the manufacture, use, and release, of AFFF containing PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bio-accumulation concerns associated with such activities.

133.    To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

134.    To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

135.    Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased

risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

136.    Even though Defendants continue to deny the harmful environmental effects and health impacts from PFAS, on April 8, 2024, the EPA promulgated individual Maximum Contaminant Levels (MCLs) under the Safe Drinking Water Act (SDWA) for PFOA and PFOS at 4.0 nanograms per liter (ng/L) or parts per trillion (ppt), the current lowest detection level under the current detection methodologies. The EPA also set a health-based goal of zero for PFOA and PFOS; reflecting that there is no safe level of exposure to these contaminants.

137.    The EPA also promulgated individual MCLs for PFHxS, PFNA, and HFPO-DA at 10 ng/L. In addition to the individual MCLs for PFHxS, PFNA, and HFPO-DA, in consideration of the known toxic effects, dose additive health concerns and occurrence and likely co-occurrence in drinking water of these three PFAS, as well as PFBS, the EPA is finalizing a Hazard Index (HI) of 1 (unitless) as the MCL for any mixture containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS.

138.    The EPA issued this rule having reviewed extensive research and science on how PFAS affects public health, engaging with the water sector and state regulators, and also considered 120,000 comments on the proposed rule prior to promulgating its final rule.

139.    Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF containing PFAS would result in the contamination of

41

the blood and/or body of Plaintiffs with PFAS, and the bio-persistence and bio-accumulation of such PFAS in their blood and/or body.

140.    Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiffs would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiffs.

141.    Defendants did not seek or obtain permission or consent from Plaintiffs before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiffs' exposure to AFFF and the contamination of Plaintiffs' blood and/or body with PFAS materials, and resulting bio-persistence and bio-accumulation of such PFAS in their blood and/or body.

**F.     AFFF Defendants' History of Manufacturing and Selling AFFF**

142.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

143.    Buckeye began to manufacture, market, and sell AFFF in the 2000s.

144.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase-out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment management." 3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk." In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

145.    Following 3M's exit from the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF that contained PFAS and/or PFAS precursors.

146.     AFFF Defendants knew their customers warehoused large stockpiles of AFFF. In fact, AFFF Defendants marketed their AFFF products by touting their long shelf life. Long after AFFF Defendants fully understood the toxicity of PFAS, and their impacts on the health of humans following exposure, AFFF Defendants continued to and did conceal the true, harmful nature of PFAS.

147.     While AFFF Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS, and/or their precursors, or in any way warn their customers that their AFFF products were harmful.

148.     Further, AFFF Defendants did not act to get their harmful AFFF products off the market.

149.     AFFF Defendants did not warn public entities, firefighter trainees who they knew could, would, and did foreseeably come into contact with their AFFF products, and/or firefighters employed by either civilian and/or military employers that use of and/or exposure to AFFF Defendants' products containing PFAS and/or its precursors posed a danger to human health.

150.     The Plaintiffs were never informed that AFFF was inherently dangerous. Nor were the Plaintiffs warned about the known health risks associated with this product.

151.     The Plaintiffs never received nor were told to use any protective gear to guard against the known dangerous propensities of this product.

152.     AFFF Defendants have known of the health hazards associated with AFFF and/or its compounds for decades and that their intended and/or common use would and did harm human health.

153.     Information and data regarding AFFF and its compounds were readily accessible to each of the above-referenced AFFF Defendants for decades. Each is an expert in the field of

AFFF manufacturing and/or the materials needed to manufacture AFFF; each has detailed information and understanding about the chemical compounds that form AFFF products.

154.    The AFFF Defendants' manufacture, distribution, and/or sale of AFFF resulted in the Plaintiffs and other individuals who came in contact with the chemical to be harmed and suffer injury.

155.    The AFFF Defendants through their manufacturing, distribution and/or sale of AFFF, and through their involvement, and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known, and/or foreseen that the Plaintiffs and those similarly situated would be harmed.

156.    The AFFF Defendants' products were unreasonably dangerous, and the Defendants failed to warn of this danger.

157.    Defendants have been manufacturing and/or using PFAS chemicals since the 1940s and continued to do so undeterred even after becoming aware of the harmful effects of these chemicals to humans and the environment.

158.    For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

159.    3M went on to market and promoted PFAS, and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including Michigan. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to the United States Air Force, including its Air Force Bases and military installations throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS.

   **G.    AFFF Containing PFOS and PFOA is Fungible and Commingled in the Groundwater**

160.     AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

161.     A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

162.     Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at any of the aforementioned Air Force Bases during fire protection, training, and response activities, resulting in widespread PFAS contamination is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally.

163.     Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability.

**H.     3M'S Knowledge and Fraudulent Cover-up of the Dangers of PFAS**

164.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

165.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals. [24]

166.     By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

---

[24] *See* Exhibit 1009, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1009.pdf

167.    3M knew as early as 1960 that chemical waste from its PFAS manufacturing facilities that was dumped into landfills or spilled on natural surfaces would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells." [25]

168.    As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

169.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about the health effects of PFAS. The studies revealed that some 3M personnel were exposed to fluorochemicals between 100 and 300 times the normal levels in their blood.

170.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

171.     By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

172.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

173.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States. [26]

174.    Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway

---

[25] *See* Exhibit 1025 at 2, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1025.pdf
[26] Technical Report Summary: re Absorption of FC 95 and FC 143 on Soil, Feb. 27, 1978, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

175.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bio-accumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

176.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

177.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. Also in 1978, a group of scientists and doctors met to review the results of various studies as part of the Fluorochemicals in Blood program. At the meeting, Dr. Harold C. Hodge told 3M's then medical director, Dr. F.A. Ubel, that employees' physical examination results should be analyzed in the context of the general population. Specifically, Dr. Hodge stated that "[t]here appears to be indications of liver change from the physical examination results."35[27]

178.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

179.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River. 3M resisted calls

---

[27] 3M Interoffice Correspondence re: Meeting Minutes – Meeting with H.C. Hodge, June 7, 1979, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2724.pdf.

from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

180.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

181.    In 1983, 3M scientists opined that those concerns about PFAS give rise to legitimate questions about the persistence, accumulation potential, and ecotoxic of [PFAS] in the environment. [28]

182.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees. [29]

183.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

184.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products which would result in the loss of hundreds of millions of dollars in annual revenue. [30]

185.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

---

[28] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988, meeting with DuPont, January 5, 1988, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[29] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

[30] See Exhibits 2144 & 2204, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co., Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp.

186.    A key priority of an internal 3M committee—referred to as the FC CoreTeam—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

187.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

188.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

189.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering a "quid pro quo" with the scientists. [31]

190.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute." [32]

---

[31] *See Id.* at Exhibit 1740 https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1740.pdf.
[32] *Id.*

191.     3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated, "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility, and image over environmental safety."[33]

192.     In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

193.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. [34]

194.     On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." [35]

195.     In a memo explaining its decision, the EPA noted that PFOS was among certain chemicals that appear to be persistent, bio-accumulative and toxic. [36]

---

[33] *See id.* at Exhibit 1001, available at
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.
[34] *See id.* at Exhibit 1690, available at
https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp
[35]     EPA, EPA and 3M Announce Phase Out of PFOS, (May 16, 2000),
https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005
246b4.html
[36] *Id.* Also, the California State Water Resources Control Board has concluded that, major sources of PFAS"
include industrial sites, landfills, and wastewater treatment plants. It elaborates: "PFAS can get into drinking
water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in
groundwater, PFAS are easily transported large distances and can contaminate drinking wells." See
California Water Board, Per- and Polyfluoroalkyl Substances (PFAS) Background,
https://www.waterboards.ca.gov/pfas/background.html.

196.     3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment at the locations Plaintiffs were exposed.

**J.     Old Dupont's Knowledge and Fraudulent Cover-up of the Dangers of PFAS and Mounting Liabilities**

197.     Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

198.     Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

199.     Old DuPont company scientists issued internal warnings about the toxins associated with their PFAS products as early as 1961.

200.     Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

201.      In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFAS exposure.

202.     This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

203.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

204.    Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

205.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

206.     Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

207.    In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

208.    While Old DuPont knew about this toxic danger as early as the 1960s, Old DuPont also was aware that PFAS could contaminate the surrounding environment and cause human exposure.

209.    In 1981, Old Dupont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defects.

210.    In 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

211.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent. Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater used for public drinking water.

212.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

213.    Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

214.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

215.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

216.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

217.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

218.    By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

219.    Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there was no adverse health effects associated with human exposure to PFOA.

220.    For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

221.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxic and exposure information for PFOA, in violation of federal environmental laws.

222.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

223.    The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

224.    Old DuPont also promised to phase out the production and use of PFOA by 2015.

225.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

226.    Old DuPont and Chemours knew or should have known that in their intended and/or common use products containing PFAS would very likely injure and/or threaten public health and the environment in Michigan.

227.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled Leach, et al. v. E. I. du Pont de Nemours & Co., Civil

Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

228.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

229.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

230.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.

231.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, and limits on the manufacture and handling of any PFOA containing product, and to develop safe nonfluorinated alternatives to these products to avoid long-term harm to human health and the environment.

232.    On May 25, 2016, the EPA released a lifetime health advisory ("HA") and health effects support documents for PFOS and PFOA.   The EPA developed the HA's to assist

governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HA's identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HA's were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS.

233.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.

234.    Old DuPont required that Chemours both directly assume its historical PFAS liabilities and indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

235.    On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8.

**K.    Old Dupont's Multi-step, Fraudulent Scheme to Isolate Its Valuable Tangible Assets from PFAS Liabilities and Hinder Creditors**

236.    By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to

PFAS contamination at other sites and areas throughout the country, and its sale of products containing PFAS, and that its liability was likely billions of dollars.

237.    These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

238.    Considering this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

239.    Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and The Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

240.    Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

241.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

242.    Old DuPont engaged in a three-part restructuring plan, further explained below.

243.    The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use

of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun off" Chemours as a separate publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

244.     Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

245.     Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct regarding PFAS.

246.     The second step involved Old DuPont and Old Dow entering an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

247.     Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

248.     The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

249.     The third step involved DowDuPont spinning off two, new, publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

250.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

251.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

**L.    The Chemours Spinoff**

252.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

253.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

254.    Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, consisting of Old DuPont's Titanium Technologies, Chemical Solutions, and fluorochemical products segments, and Chemours became a separate, publicly traded entity.

255.    The Performance Chemicals Business included fluorochemical products and the business segment that had manufactured, used, and discharged PFOA into the environment.

256.    Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

257.    On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

258.    On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

259.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015, Separation Agreement (the "Chemours Separation Agreement").

260.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including approximately 37 active chemical plants.

261.    Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

262.    At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

263.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

264.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours

distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

265.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

266.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

267.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment.

268.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross

negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

269.    The Chemours Separation Agreement also required Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

270.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont concerning any order, decree, judgment, agreement, or action for Old DuPont's environmental liabilities.

271.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

272.    There was no meaningful, arms-length negotiation of the Separation Agreement.

273.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

274. Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

275. Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

276. It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

277. Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

278. At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding a total net worth of $130 million.

279. Removing Chemours' goodwill and other intangibles of $176 million yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but

giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

280.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

281.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

282.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

**M.    Step 2: The Old Dow / Old Dupont "Merger"**

283.    After the Chemours Spinoff, Old DuPont took the untenable position that it was not responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, not with Old DuPont.

284.    However, Old DuPont could not contractually discharge all its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

285.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including potentially massive punitive damages. So Old DuPont moved to the

next phase of its scheme. On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

286.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (i.e., New DuPont) and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

287.    Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, because of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

288.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (i.e., New DuPont).

N.    **Step 3: The Shuffling, Reorganization, and Fraudulent Transfer of Assets Away  from Old Dupont and Separation of Corteva and New Dow**

289.    Following the Dow-DuPont Merger, DowDuPont (i.e., New DuPont) underwent a significant internal re-organization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

290.    While, again, the details of these transactions remain hidden from Plaintiffs and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (i.e., New DuPont) was in preparation for the conglomerate being split into three, separate, publicly traded companies.

291.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (i.e., New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

292.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (i.e., New DuPont), for far less than the assets were worth. Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (i.e., New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became

293.     Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (i.e., New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (i.e., New DuPont) retained the specialty products business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

294.     The mechanics of the separations are governed by the April 1, 2019, Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (i.e., New DuPont) (the "DowDuPont Separation Agreement"). The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

295.     Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii)New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

296.     Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro-rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation

Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

297.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (i.e., New DuPont) distributed all New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker, "DOW."

298.    On or about May 2, 2019, DowDuPont (i.e., New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

299.    Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

300.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all Corteva's common stock to DowDuPont (i.e., New DuPont) stockholders as a pro rata dividend.

301.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below with substantially fewer tangible assets than they had prior to the restructuring.

302.    On or about June 1, 2019, Dow DuPont changed its registered name to Dupont de Nemours (meaning New Dupont).

303.    The net outcome of these transactions was to strip Old Dupont of its substantial tangible assets and transfer them to the new Dupont and Corteva for far less than they were originally worth.

304.    Old Dupont expected that the Dow-DuPont merger created 'goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this 'goodwill" was assigned to Old-DuPont Dow-DuPont to prop up its balance sheet. The Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

305.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

306.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

307.    Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

308.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

309.     That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

310.     As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of assets, including "goodwill" from its successive restructuring activities.

311.     At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

312.     Old DuPont's financial condition has continued to deteriorate. By the end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

313.     Old DuPont's tangible net worth between September 30, 2019, and December 31, 2019, declined even further, whereby Old DuPont ended fiscal year 2019 with a tangible net worth of negative $1.125 billion.

314.     New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

315.     Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned

subsidiary, Old DuPont. However Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

### O.   Old Dupont and Related Entities' Plans to Shield Assets from EFAS Liabilities

316.    By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

317.    Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

318.    In or around 2014, Old DuPont formed The Chemours Company as a wholly owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

319.    At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

320.    Upon information and belief, prior to the spinoff, Chemours was a wholly owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont

employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

321.   In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

322.   Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

323.   Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

324.   Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spin-off if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

325.   Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

326.   Old DuPont knew that Chemours was under-capitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

327.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

328.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

329.     By 2019, DowDuPont spun off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

330.     Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

331.     Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

## CAUSES OF ACTION

## COUNT I: STRICT LIABILITY - DESIGN DEFECT

332.     Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

333.     As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom their products might

foreseeably harm, including Plaintiffs, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

334.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

      a.    PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

      b.    Even at extremely low levels, PFAS render drinking water unfit for consumption;

      c.    PFAS poses significant threats to public health; and

      d.    PFAS creates real and potential environmental damage.

335.    Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

336.    AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs.

337.    At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' injuries.

338.    The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

339.    The likelihood that Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and Plaintiffs' water supplies has been, and continues to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs

significant injuries and damages that far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

340.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Plaintiffs' water supplies have been and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages.

341.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs' water supply with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages. Contamination that led to the exposure of Plaintiffs to toxins and increased their risk of numerous diseases. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

## COUNT II:  STRICT LIABILITY - FAILURE TO WARN

342.    This cause of action is asserted against all Defendants on behalf of the Plaintiff.

343.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

344.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated used.

345.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

a.  PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

b.  Even at extremely low levels, PFAS render drinking water unfit for consumption

c.  PFAS poses significant threats to public health; and

d.  PFAS creates real and potential environmental damage.

346.  Defendants knew of the health and environmental risks associated with their AFFF/Component Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiffs' injuries.

347.  Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their AFFF/Component Products in the vicinity of drinking water supplies, including PFAS contamination of the drinking supplies, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiffs, governmental agencies or the public.

348.  As a direct and proximate result of Defendants' failure to warn, Plaintiffs' water supplies have ben, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages. Further, this contamination led to the exposure of Plaintiffs to toxins and increased their probabilities of numerous diseases as more fully set forth above.

349.  Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs water supply with PFAS in varying amount, causing Plaintiffs significant injuries and damages. Defendants committed each of the above-described

acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety.

### COUNT III: STRICT LIABILITY – ABNORMALLY DANGEROUS ACTIVITY

350.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

351.    At all relevant times, Defendants designed, manufactured, marketed, distributed, sold, disposed of, discharged, and emitted hazardous substances from the facilities which they owned, controlled, and operated.

352.    As a result of Defendants' discharging such substances from their sites, the groundwater under Plaintiffs' residences and/or places of employment were contaminated with hazardous substances, creating actual harm to Plaintiffs.

353.    The manufacture, utilization, disposal, and discharge of PFAS and other toxins constitute abnormally dangerous activities that introduce an unusual danger in the community.

354.    Defendants' activities in selling, manufacturing, utilizing, disposing, and discharging of these products presented a high degree of risk of harm to humans and the environment.

355.    It was likely that the harm resulting from Defendants' activities would be great. The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

356.    Defendants' activities are not a matter of common usage in the areas in which they were carried out.

357.    Defendants' activities were inappropriate to the locations in which they were carried out.

358.     The dangerous attributes of and risk posed by Defendants' activities outweighed their value to the community.

359.     The manufacture, utilization, disposal, and discharge of these products are not matters of common usage in the areas where the activities were carried out.

360.     Defendants' acts and omissions in designing, marketing, selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination of Plaintiffs' drinking water and injuries and damages to Plaintiffs, making them strictly liable for the harm caused by such contamination.

361.     Defendants all foreseeably contributed to the contamination of the environment and Plaintiffs' drinking water with PFAS and other toxins, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury and damages to Plaintiffs as set forth.

362.     As a direct and proximate result of Defendants' discharge of hazardous substances and contaminants, Plaintiffs have and will continue to suffer damages.

**COUNT IV: STRICT LIABILITY – STATUTORY**

363.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint as if restated in full herein.

364.     Plaintiffs assert any and all remedies available under statutory causes of action of the Plaintiffs' states for strict liability against each Defendant.

365.     The Defendants were engaged in designing, manufacturing, marketing, selling, and distributing AFFF.

366.     AFFF was in a defective condition and unreasonable dangerous to users and/or consumers when designed, manufactured, marketed, sold, and/or distributed to the public by the Defendants.

367.     As a direct and proximate result of the Defendants' products' aforementioned defects, the Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages, including, but not limited to, medical expenses and other damages.

368.     The Defendants are strictly liable in tort to the Plaintiffs for their wrongful conduct.

## COUNT V: NEGLIGENCE

369.     Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

370.     As manufactures of AFFF products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to Plaintiffs and to all persons whom their products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

371.     Defendants owed a duty to Plaintiffs to act reasonably and not place inherently dangerous AFFF products into the marketplace when its release into the air, soil, and water was imminent and certain.

372.     Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

373.     Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

374.     Defendants knew or should have known that the manner in which they were designing, manufacturing, distributing, and selling their AFFF products would result in contamination of Plaintiffs' water supplies with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages.

375.     Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources, and are carcinogenic, Defendants negligently:

      a.     designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

      b.     issued deficient instructions on how their AFFF/Component Products should be used and disposed of, thereby permitting PFAS to contaminate the groundwater in and around the Site;

      c.     failed to recall and/or warn the users of their AFFF/Component Products of the dangers of groundwater contamination as a result of standard use and disposal of their products;

      d.     failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products; and

      e.     failed to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

376.     The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

377.     As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products, and to take steps to eliminate, correct, or remedy any contamination they caused.

378.     As a direct and proximate result of Defendants' negligence, Plaintiffs' water supplies have been contaminated with PFAS, in varying amounts of time, causing Plaintiffs significant injuries and damages.

379.     Defendants knew that it was substantially certain that their acts and omissions described above would cause Plaintiffs' water supply to be contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

## COUNT VI: BATTERY

380.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

381.     At all relevant times, Defendants possessed knowledge that the AFFF containing PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio-persistent, bio-accumulative, toxic, potentially carcinogenic, and/or harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiffs having PFAS in their blood, and the biopersistence and bioaccumulation of such PFAS in Plaintiffs' Blood.

382.     However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiffs accumulating PFAS in their blood and/or bodies, and such PFAS persisting and accumulating in Plaintiffs' blood and/or bodies such that it eventually manifested into an injury.

383.     Defendants did not seek or obtain permission or consent from Plaintiffs to put or allow PFAS materials into their blood and/or bodies, or to persist in and/or accumulate in Plaintiffs' blood and/or body.

384.     Entry into, persistence in, and accumulation of such PFAS in Plaintiffs' blood and/or bodies without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiffs' persons and unreasonably interferes with Plaintiffs' rightful use and possession of their blood and/or bodies.

385.     At all relevant times, the PFAS present in the blood of Plaintiffs originated from Defendants' acts and/or omissions.

386.     Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiffs that resulted in persisting and accumulating levels of PFAS in Plaintiffs' blood.

387.     Plaintiffs, and any reasonable person, would find the contact at issue harmful and/or offensive.

388.     Defendants acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS with, onto and/or into Plaintiffs' blood, including its persistence and accumulation in the blood, was substantially certain to result from those very acts and/or omissions.

389.     Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiffs' blood and/or bodies.

390.     The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiffs is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

391.    The presence of PFAS in the blood and/or body of Plaintiffs altered the structure and/or function of such blood and/or body parts and resulted in injury.

392.    As a direct and proximate result of Defendants' negligence, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses and other damages.

## COUNT VII: CONCEALMENT, MISREPRESENTATION, AND FRAUD

393.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

394.    The Defendants have a general duty to inform Plaintiffs about the actual and potential harm to Plaintiffs from direct and proximate exposure to Defendants' chemical products.

395.    The Defendants negligently, knowingly, willfully, and maliciously concealed and falsely misrepresented information concerning the harmful nature of the fluorochemicals from Plaintiffs with the intent to deceive Plaintiffs. Plaintiffs thereby suffered and continue to suffer harm and damage.

396.    Defendants knew that information concerning the safety risks associated with fluorochemicals and their presence in Defendants' products were material facts to Plaintiffs.

397.    Defendants committed fraud against Plaintiffs by affirmatively representing that Defendants' fluorochemical products were harmless and did not present any risk of harm, when Defendants knew, reasonably should have known, or had cause to know, that their products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Plaintiffs.

398.    Plaintiffs relied on Defendants' affirmative representations and/or omissions in believing that Defendants' fluorochemical products were safe. Plaintiffs thereby continued to use and/or be exposed to the fluorochemical products, and in not seeking treatment and/or ways to

remedy their past exposure to Defendants' fluorochemical products. If Plaintiffs knew otherwise, Plaintiffs would have acted reasonably and differently to reduce or prevent their exposure, including finding alternative sources of drinking water.

399.    Defendants are liable to the Plaintiffs.

**COUNT VIII: ACTUAL FRAUDULENT TRANSFER (DuPont and Chemours Co.)**

400.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further alleges the following:

401.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").\

402.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

403.    At the time that the Transfers were made, and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

404.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

405.    Plaintiffs have been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

406.    Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

**COUNT IX: CONSTRUCTIVE FRAUDULENT TRANSFER (DuPont and Chemours Co.)**

407.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further alleges the following:

408.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

409.    Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

410.    At the time that the Transfers were made, and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

411.    The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

412.    Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

413.    At the time that the Transfers were made, and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

414.    Plaintiffs have been harmed as a result of the Transfers.

415.    Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## COUNT X: PUNITIVE DAMAGES

416.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further alleges the following:

417.     Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing damage upon Plaintiff, disregarding their protected rights.

418.     Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably to Plaintiffs' water supply which was contaminated and continues to be contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injury and damage.

419.     Defendants have caused great harm to Plaintiffs, acting with implied malice and an outrageously conscious disregard for Plaintiffs' rights and safety, such that the imposition of punitive damages is warranted.

## COUNT XI: TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

420.     Plaintiffs did not know, nor could they have reasonably discovered by the exercise of reasonable diligence, that exposure to fluorochemical products, including AFFF, was harmful to human health. The risks of said chemicals and AFFF were not obvious to the users of AFFF, nor were they obvious to individuals such as Plaintiffs in the vicinity of AFFF use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products, they could not protect themselves from exposure to Defendants' fluorochemical product. For this reason, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

421.     Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure

to AFFF is harmful to human health within the time period allowed by any applicable statute of limitations.

422.     During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products. Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

423.     Wherefore, all applicable statutes of limitations pertaining to Plaintiffs' claims have been tolled by operation of the discovery rule.

### Fraudulent Concealment

424.     Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

425.     This fraudulent concealment continues to the present day.

426.     Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

### Estoppel

427.     Defendants were under a continuous duty to consumers, end users, and other persons, such as Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

428.    Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF, and the health risks associated with the same.

429.    Wherefore, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants as follows:

a.    Entry of judgment in Plaintiff's favor and against all Defendants, jointly and severally, as applicable, on each Count of this Complaint;

b.    Compensatory damages to Plaintiffs for past and future damages, including but not limited to pain and suffering for severe and permanent injuries sustained by Plaintiffs, medical costs, and medical monitoring.

c.    Damages associated with fear of developing future serious diseases or illnesses such as cancers;

d.    Interests and costs as provided by law;

e.    An award to Plaintiffs for the fees and costs of these proceedings (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

f.    An award for punitive damages for the wanton, willful, fraudulent, and/or reckless acts of the Defendants in an amount sufficient to punish Defendants and deter future similar conduct; and

g.    An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated: July 31, 2025

Respectfully submitted,

/s/ C. David Durkee
C. DAVID DURKEE
FLORIDA BAR NO.: 998435

JASON P. FRANK
FLORIDA BAR NO.: 1049042
THE DOWNS LAW GROUP, P.A.
3250 Mary Street, Suite 307
Coconut Grove, FL 33133
Telephone (305) 444-8226
Facsimile: (305) 333-6773
Email: ddurkee@downslawgroup.com

*Attorneys for Plaintiff*